IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DOROTHY STONE                    :          CIVIL ACTION
                                 :
          v.                     :
                                 :
TRADER JOE'S COMPANY             :          NO. 15-3294

MEMORANDUM

Bartle, J.                                      May 13, 2016

          Plaintiff Dorothy Stone ("Stone") has sued her

employer, Trader Joe's Company ("Trader Joe's"), for age

discrimination and retaliation.  Her complaint alleges

violations of the Age Discrimination in Employment Act of 1967

("ADEA"), 29 U.S.C. §§ 621 et seq., and the Pennsylvania Human

Relations Act ("PHRA"), 43 Pa. Stat. §§ 951 et seq.

          Before the court is the motion of Trader Joe's for

summary judgment on each of Stone's claims.

                                I.

          Summary judgment is appropriate "if the movant shows

that there is no genuine issue as to any material fact and the

movant is entitled to judgment as a matter of law."  Fed. R.

Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).[1]  A dispute is genuine if the evidence is such that a

---

1.  Rule 56(c)(1) states:

          A party asserting that a fact cannot be or is
          genuinely disputed must support the assertion
          by . . . citing to particular parts of
          materials in the record, including

reasonable factfinder could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254 (1986). Summary judgment is granted where there is insufficient record evidence for a reasonable factfinder to find for the nonmovant. Id. at 252.  "The mere existence of a scintilla of evidence in support of the [nonmoving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find" for that party.  Id.

When ruling on a motion for summary judgment, we may only rely on admissible evidence.  See, e.g., Blackburn v. United Parcel Serv., Inc., 179 F.3d 81, 95 (3d Cir. 1999).  We view the facts and draw all inferences in favor of the nonmoving party. In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir. 2004).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment."  Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990).

---

depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

A party asserting that a particular fact "cannot be or is genuinely disputed" must support its assertion by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).  In reviewing a motion for summary judgment, the court may consider any materials in the record but is not required to look beyond those materials cited by the parties.  Fed. R. Civ. P. 56(c)(3).  It is not the responsibility of the court to "comb the record in search of disputed facts."  N.J. Carpenters Pension Fund v. Hous. Auth. & Urban Redevelopment Agency of the City of Atl. City, 68 F. Supp. 3d 545, 549 (D.N.J. 2014).  As our Court of Appeals has emphasized, "[j]udges are not like pigs, hunting for truffles buried in briefs."  Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 n.8 (3d Cir. 2006) (quoting United States v. Dunkel, 927 F.2d 955, 956 (7th Cir. 1991)).

II.

The following facts are undisputed or viewed in the light most favorable to Stone as the nonmovant.

Stone is 66 years old.  Her employment with Trader Joe's, a grocery store chain, began in 2002 at the company's location in Jenkintown, Pennsylvania (the "Jenkintown store").  She still remains an employee at that location.  When she was hired,

Stone was classified by Trader Joe's as a "demo specialist."
Employees who work in "demo" offer samples of Trader Joe's products
to customers.  For approximately the first ten years of her
employment, Stone was scheduled to work whenever she was available.
This was generally on Thursdays from 10 a.m. to 5 p.m. and on
Fridays and Saturdays from 11 a.m. to 6 p.m.  "For a while" during
that period she began her workday at 7:30 a.m.

In 2011, Trader Joe's implemented a policy change
whereby all of its nonmanagerial employees, which it refers to as
"Crew" or "Crew members," would be assigned to a range of tasks
such as working at cash registers, stocking shelves, cleaning, and
speaking to customers.  Crew members would no longer concentrate on
specific areas such as demo.  At around the same time, the
Jenkintown store hired a number of new Crew members.  Thereafter,
Stone began to be assigned fewer work hours.  In 2011 she averaged
46.18 paid hours of work per week, while in 2012 she averaged only
41.28 hours per week.  At the time, Stone did not express any
dissatisfaction about the reduction in hours.  She did ask that she
be assigned to work only every other Saturday.

In January 2013, Stone received a performance review
from Camille Adams ("Adams"), who was at the time the "Captain," or
manager, of the Jenkintown store.  Adams gave Stone an overall
rating of "does not meet expectations" and offered areas for
potential improvement.  Upon receiving the review, Stone had what

-4-

she now describes as a "meltdown."  She followed up in February 2014 by contacting Diane Carroll ("Carroll"), a member of the Trader Joe's human resources staff.  During their conversation, Stone characterized the January 2013 review as unfair and suggested that she was considering quitting her job or transferring stores. Stone also expressed concern that Trader Joe's wanted to eliminate her from its staff because she was "capped out," meaning that she had worked for the company for so long that she was paid the maximum available hourly wage.

Within days of the conversation between Stone and Carroll, Adams was transferred from the Jenkintown store to another Trader Joe's location.[2]  She was replaced by David Wagenschutz ("Wagenschutz").  During Stone's July 2013 performance review, Wagenschutz gave her an overall rating of "meets expectations," although he noted that she had a tendency to become defensive.  He suggested that she "work on the tone and style of her communication" and "focus on active listening or taking notes."

Wagenschutz served as Captain of the Jenkintown store until late August 2013, at which point he was replaced by Anthony Fernandez ("Fernandez").  Fernandez was never made aware of the February 2014 conversation between Stone and Carroll.

---

2.  The transfer of Adams was unrelated to Stone's dissatisfaction with her review.

Around the time of the arrival of Fernandez in August 2013, Trader Joe's adopted a computer scheduling system called Dayforce.  Dayforce works as follows:  Crew members input their availability into the system, indicating when they are and are not available to work.  The store's management, meanwhile, inputs and adjusts certain performance indicators, such as sales per hour, hours required prior to opening and closing, and historical sales. Dayforce takes into consideration the availability submitted by the employees and the need-based data submitted by managers and uses this information to generate a schedule.  There is no evidence that the age of employees was ever inputted into the computer.

The supervisor using Dayforce can then make slight modifications to the proposed schedule.  Stone has pointed to no evidence that any of the Captains or Mates ever made such changes to her schedule once it had been generated by Dayforce.

Because Dayforce takes into consideration the availability of each Crew member, a Crew member who inputs a broader range of availability is more likely to be assigned shifts. When a Crew member's availability does not coincide with a normally-scheduled shift, Dayforce generally will not schedule that Crew member for the hours for which he or she is available.

In August 2013, Stone indicated that she was available from 9 a.m. until 6 p.m. on Thursdays, Fridays, and most Wednesdays.  In November 2013, she further modified this

availability to Thursdays, Fridays, every other Wednesday, and some but not all Saturdays.  She was not available at all on Sundays, Mondays, or Tuesdays.  During the same time period, Crew members at the Jenkintown store were assigned the following shift start times: 5 a.m., 6 a.m., 7 a.m., 11 a.m., 12 p.m., 1 p.m., 2 p.m., and 3 p.m.  The majority of Crew members were assigned to the 5 a.m., 6 a.m., 7 a.m., 2 p.m., and 3 p.m. start times.  By Fernandez's assessment, Stone "was not available to work the shifts that the store needed to be able to adequately staff the store for its basic operations and to commit to providing a good experience for our customers."

When Fernandez took over as Captain, Stone was often scheduled to work whenever she was available since the store was understaffed.  Dayforce would sometimes assign Stone a split shift in order to ensure that the store was adequately staffed.  This resulted in Stone receiving more hours.  Fernandez subsequently hired new Crew members.  This made it possible for the Jenkintown location to be "able to schedule to fit the demand of the store better," since there were "more crew members available to work those shifts."  As a result, Stone began to be scheduled less frequently.  She also stopped being assigned split shifts.  At least one Mate advised Stone that she could receive more hours by increasing her availability in Dayforce.

During Fernandez' tenure as Captain of the Jenkintown
store, few if any of the employees hired were over the age of 40.
Fernandez, in his deposition, explained that this was because
"[t]he application process at Trader Joe's is focused on ensuring
that we hire for what is appropriate for Trader Joe's.  We're
looking for crew members who are going to make . . . Trader Joe's
great crew members in the future and that we see the potential for
that in the people we hire."  Asked whether he believed that
"someone younger is probably better able to handle the physical
aspects of the job in terms of lifting produce, pushing those carts
with all that produce on, than someone who perhaps is older,"
Fernandez responded in the affirmative.

While Fernandez was Captain, Jeannine Deni ("Deni"), who
was a "Mate," or supervisor, observed "a pattern of addressing
behaviors targeted towards people that were over 50 where that was
not the same for people who were 30 and younger."  Deni testified
that the instruction "came down from" Fernandez that the Mates at
the Jenkintown store should "watch" Stone and another older Crew
member named Peggy Zachmy ("Zachmy").  The Mates, according to
Deni, were to "give [Stone and Zachmy] responsibilities that were
out of their range of what they normally did day-to-day and had
been doing for years."[3]

---

3.  Stone directs our attention to Deni's testimony about
remarks made by other Mates at the Jenkintown store.  For

Stone complained to Fernandez on at least several occasions that her scheduled hours, and in particular her demo hours, had been reduced.  Fernandez promised to give her more demo hours.  He also informed Stone that he was interested in "making [Stone] a more well-rounded crew member."

In January 2014, when Fernandez had been Captain of the Jenkintown store for approximately four months, he gave Stone a performance review in which he scored her with the ranking "does not meet expectations."  He did so again in July 2014.  In August 2014 Stone again reduced her availability.  She inputted into in Dayforce that on the days she could work she was only available from 10 a.m. until 5:30 p.m.  At her next review in January 2015, Fernandez gave her a "meets expectations" rating and a pay raise.

In May 2015 Fernandez left his position as Captain of the Jenkintown store.  He was replaced by Jose Aguilera ("Aguilera").  During Stone's July 2015 performance review, Aguilera gave her overall ratings of "meets expectations" as well as a raise.  He also offered to ensure that she was scheduled three

---

example, Deni testified that one of her fellow Mates commented to her that Fernandez was giving Stone and Zachmy "a bunch of stuff that you know they are not going to be able to do and then you get rid of them."  Another Mate complained to Deni that Fernandez had pressured him to give Stone a negative review, telling him that "Dorothy isn't keeping up with things like the computer."  Stone has not explained why these statements are not inadmissible hearsay.  See Fed. R. Evid. 802.  As noted above, we may only rely on admissible evidence when ruling on a motion for summary judgment.  See, e.g., Blackburn, Inc., 179 F.3d at 95.

days per week.  In her deposition, Stone recalled responding:  "You know, Jose, I can't do it now.  I don't have the availability anymore.  I've had to go on and do other things because they took so much away from me."  Since September 2015, Stone has only been available to work on Sundays between 10 a.m. and 5 p.m.  At her January 2016 performance review, Aguilera again gave her a rating of "meets expectations."

III.

We first address Stone's claim that Trader Joe's discriminated against her in violation of the ADEA.  In her Complaint, Stone alleges that the reductions in her hours "constitute age discrimination."  She appears also to contend that Trader Joe's discriminated against her by limiting her opportunities to work on demo and by giving her ratings of "does not meet expectations" on various occasions.

The ADEA makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  In order to prevail on a claim under the ADEA, "a plaintiff must establish, by a preponderance of the evidence, that age was the 'but-for' cause of the adverse employment action."  Willis v. UPMC Children's Hosp. of Pittsburgh, 808

-10-

F.3d 638, 644 (3d Cir. 2015) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009)).

As an initial matter, Stone insists that she has demonstrated age discrimination through direct, rather than circumstantial evidence.  She urges that as a result she need not establish a prima facie ADEA claim.  See Seretti v. Morrow Ford Lincoln Mercury, Inc., No. 10-1227, 2012 WL 933058, at *3 (W.D. Pa. Mar. 19, 2012).  We find Stone's argument to be without merit.  "Direct evidence" is that which is "sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on the plaintiff's age in reaching their decision."  However, if discrimination must be inferred "from the employer's remarks or actions, then the evidence is not direct evidence of discrimination."  Weightman v. Bank of N.Y. Mellon Corp., 772 F. Supp. 2d 693, 702 (W.D. Pa. 2011) (citing Torre v. Casio, Inc., 42 F.3d 825, 829 (3d Cir. 1994)).

Seretti, on which Stone relies, involved an ADEA claim brought by a plaintiff who had been fired from his position as General Manager of a car dealership.  2012 WL 933058, at *1. The plaintiff's supervisor had explained that plaintiff's "age had caught up with him."  Id.  The Seretti court held that "a reasonable jury could conclude . . . that [the supervisor]'s remark to Plaintiff . . . is direct evidence of age based discrimination."  Id. at *4.  Here, in contrast, any

-11-

discrimination must be inferred from the evidence identified by
Stone.  See Weightman, 772 F. Supp. 2d at 702.  She has not
adduced direct evidence of age discrimination.

Consequently, Stone must rely on circumstantial
evidence in order to succeed on her age discrimination claim.
ADEA claims based upon such evidence "proceed according to the
three-part burden-shifting framework set forth in McDonnell
Douglas Corp. v. Green," 411 U.S. 792 (1973).  Willis, 808 F.3d
at 644.  This framework requires a plaintiff first to establish
a prima facie case of discrimination.[4]  Id. (citing Keller v.
Orix Credit All., Inc., 130 F.3d 1101, 1108 (3d Cir. 1997)).
Once she has done so, the burden of going forward shifts to her
employer, who "must 'articulate a legitimate nondiscriminatory
reason for the adverse employment action.'"  Id. (quoting Jones
v. Sch. Dist. of Phila., 198 F.3d 403, 412 (3d Cir. 1999)).  At
this stage, the employer has a "relatively light" burden and
"need only 'introuce[] evidence which, taken as true, would
permit the conclusion that there was a nondiscriminatory reason

_____

4.  An ADEA plaintiff establishes a prima facie case of
discrimination by demonstrating that (1) she is at least forty
years old, (2) she "suffered an adverse employment decision,"
(3) she "was qualified for the position in question," and
(4) she "was ultimately replaced by another employee who was
sufficiently younger so as to support an inference of a
discriminatory motive."  Willis, 808 F.3d at 644 (citations
omitted).  Alternatively, the fourth element can be satisfied by
facts which "if otherwise unexplained, are more likely than not
based on the consideration of impermissible factors."  Id.
(citation omitted).

for the unfavorable employment decision." Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (citing Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994)).

If the employer articulates a nondiscriminatory reason, the burden shifts back to the plaintiff to point to "evidence that the rationale is pretextual." Id. (citation omitted).  She can do so either by "point[ing] to evidence that would allow a factfinder to disbelieve the employer's reason for the adverse employment action" or by identifying "evidence that would allow a factfinder to believe that an invidious discriminatory reason was 'more likely than not a motivating or determinative cause' of the employer's action." Willis, 808 F.3d at 644-45 (quoting Fuentes, 32 F.3d at 764, 765.

For the purposes of the instant motion Trader Joe's concedes that Stone has established a prima facie case of discrimination.  The burden thus shifts to Trader Joe's to "articulate a legitimate nondiscriminatory reason for" its actions.  See Willis, 808 F.3d at 644 (quoting Jones, 198 F.3d at 412).  Trader Joe's has satisfied this "relatively light" burden.  See Tomasso, 445 F.3d at 706 (citing Fuentes, 32 F.3d at 763).  It has explained that Stone's hours were reduced because her stated availability was inconsistent with the staffing needs of the Jenkintown store.  What is more, it is undisputed that Stone's schedule was created not by her

-13-

supervisors but by Dayforce.   There is no evidence that Dayforce, a computer system, considered the employee's age in producing the work schedule.   While Captains had the ability to modify the schedules generated by Dayforce, Stone has pointed to no evidence that Fernandez or any other Captain did so. Meanwhile, the reductions in Stone's time on demo are explained by the companywide policy change that was implemented in 2011. Finally, it is undisputed that when Stone's supervisors gave her "does not meet expectations" ratings, they explained to her their reasons for doing so, which were not age related.   Taken as true, these justifications "would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision."   See id.

Stone apparently interprets the company's explanations differently.   She maintains that Trader Joe's is essentially blaming Dayforce for the reduction in her hours by claiming that Dayforce, as a computer system, is incapable of discrimination. According to Stone, this is an impermissible lay opinion. Stone's argument misreads the explanation proffered by Trader Joe's.   In reality, Trader Joe's states that Stone's scheduled hours decreased "for two reasons: (1) [her] decreased availability, and (2) the increased availability of newly hired crew."   This justification has nothing to do with whether Dayforce is or is not capable of discrimination.

-14-

Even assuming that the legitimate nondiscriminatory reason proffered by Trader Joe's is that Dayforce generates the Crew members' schedules, we reject Stone's contention that the company is improperly relying on a lay opinion. Again Stone cites to nothing in the record to indicate that Dayforce takes an employee's age into consideration when creating that employee's schedule. Indeed, there is no evidence that data about the age of employees is even inputted into Dayforce. The assertion that Stone's schedules were generated by Dayforce suffices as a legitimate nondiscriminatory reason for her reduced hours.

Because Trader Joe's has articulated legitimate nondiscriminatory reasons for its actions, the burden shifts back to Stone to point to evidence that the legitimate, nondiscriminatory reason proffered by Trader Joe's was pretextual. See Willis, 808 F.3d at 644 (citations omitted). Stone urges that the testimony of Deni creates a genuine issue of material fact as to whether the explanation proffered by Trader Joe's is pretextual. According to Stone, Deni's testimony illuminates "inconsistencies and implausibilities" in the reason given by Trader Joe's.

Stone notes that according to Deni the Jenkintown store did not hire employees over the age of 40 while Fernandez was Captain, instructions "came down" from Fernandez that Mates

-15-

were to "watch" Stone and Zachmy, and one Mate was pressured by
Fernandez to write a bad review for Stone.  She also contends
that the testimony of Fernandez "strongly suggests an age bias."
However, as explained above, much of Deni's testimony amounts to
inadmissible hearsay which we cannot consider.  See, e.g.,
Blackburn, Inc., 179 F.3d at 95.  Furthermore, none of the
evidence identified by Stone gives rise to a genuine dispute of
material fact as to whether there are "inconsistencies and
implausibilities" in the explanation given by Trader Joe's.  The
fact that Mates were instructed by Fernandez to "watch" Stone
and the fact that Stone on some occasions received negative
reviews do not implicate her age.  In addition, Stone has
identified no relationship between the fact that Trader Joe's
only hired employees under the age of 40 during the tenure of
Fernandez and the decision of Stone herself to input only
limited availability into Dayforce, the companywide policy
change regarding demo assignments, or the sometimes negative
reviews received by Stone.  As to Stone's contention that the
testimony of Fernandez suggests an age bias, she has identified
nothing in therein that would cast doubt upon the legitimate
nondiscriminatory reasons advanced by Trader Joe's.

Stone also appears to argue that in the alternative
there is evidence "that would allow a factfinder to believe that
an invidious discriminatory reason was more likely than not a

-16-

motivating or determinative cause" of the reduction in her
hours.  See Willis, 808 F.3d at 645 (citation omitted).  To
succeed on such an argument, Stone would need to "present
evidence 'with sufficient probative force' so as to allow the
factfinder to 'conclude by a preponderance of the evidence that
age was a motivating or determinative factor.'"  See id.
(quoting Simpson v. Kay Jewelers, Div. of Sterling, Inc.,
142 F.3d 639, 645 (3d Cir. 1998)).  She has not done so.  Even
given the facts that suggest that Fernandez was trying to hire
employees who were 40 or younger, there is no indication that
this factor or Stone's age had anything to do with the reduction
in her hours, the fact that she was asked to work in areas other
than demo, or the negative evaluations she received.  See id.

                              IV.

        We next turn to Stone's assertion that Trader Joe's
retaliated against her.  Stone appears to claim that she was
subjected to retaliation for expressing to Carroll her concern
that Trader Joe's was trying to "get rid of" her because she was
"capped out" and for complaining to Fernandez about the
reduction in her hours.

            The ADEA makes it

            unlawful for an employer to discriminate
            against any of his employees . . . because
            such individual . . . has opposed any
            practice made unlawful by this section, or
            because such individual . . . has made a

                              -17-

> charge, testified, assisted, or participated
> in any manner in an investigation,
> proceeding, or litigation under this
> chapter.

29 U.S.C. § 623(d).  To establish a claim of retaliation under the ADEA, a plaintiff must show that "(1) he was engaged in protected activities; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action."  Glanzman v. Metro. Mgmt. Corp., 391 F.3d 506, 508-09 (3d Cir. 2004) (citing Farrel v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000)).

In order to amount to "protected activity," a complaint "need not be written or formal."  Zielinski v. Whitehall Manor, Inc., 899 F. Supp. 2d 344, 354 (E.D. Pa. 2012) (citation omitted).  We must consider "the content of the complaint, rather than its form."  Id.  However, "general" or "vague" complaints of unfair treatment do not amount to protected activity for the purposes of a retaliation claim.  Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995); see also Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 195 (3d Cir. 2015).  Such complaints must be specific enough to put an employer on notice of the specific kind of discrimination being alleged.  Barber, 68 F.3d at 702; see also Sanchez v.

SunGard Availability Servs., LP, 362 F. App'x 283, 288 (3d Cir. 2010)).

Stone has called nothing to our attention in the record that she engaged in "protected activity."  She merely contends that she expressed concern to Carroll in 2013 about her status as a "capped-out" employee and later complained to Fernandez about the reduction in her hours.  No reasonable factfinder could conclude that the concern Stone expressed to Carroll was specific enough to notify Trader Joe's that Stone believed she was being subjected to discrimination.  See Barber, 68 F.3d at 702.  Stone's grievance was merely a "general complaint of unfair treatment."  See id. at 701.  More significantly, it is undisputed that Fernandez did not know about Stone's complaint to Carroll during the time period when Stone's hours were being reduced.

We reject Stone's argument that her complaint to Carroll about being "capped-out" was in effect a "proxy" for a complaint of age discrimination.  It is uncontradicted that some Crew members at the Jenkintown store were older than Stone but were not "capped-out."  There is no evidence that "capped-out" refers, or could be interpreted to refer, to anything other than the fact that an employee has worked for Trader Joe's for a sufficiently long period that he or she is paid the maximum available hourly wage.  Moreover, even if we were to accept

Stone's interpretation, it is not relevant.  It is undisputed
that Fernandez was unaware of Stone's conversation with Carroll.
Stone has not referred to any evidence of a causal link between
that conversation and the ostensibly adverse employment actions.
See Glanzman, 391 F.3d at 509 (citation omitted.

        Stone likewise cannot succeed on a retaliation claim
based on her complaints to Fernandez that her hours were being
reduced.  Stone has not indicated precisely when she made these
complaints.  Further, she cites nothing in the record that these
complaints made any reference whatsoever to her age or to age
discrimination.

        Trader Joe's is thus entitled to summary judgment on
Stone's ADEA retaliation claim.  We need not reach the argument
of Trader Joe's that there is no "causal link . . . between the
[Stone's] protected activity and the . . . adverse action" of
Trader Joe's.  See Glanzman, 391 F.3d at 509 (citation omitted).

                                V.

        Finally, Stone contends that Trader Joe's violated the
PHRA.  Our Court of Appeals has stated that "the PHRA is to be
interpreted as identical to federal anti-discrimination laws
except where there is something specifically different in its
language requiring that it be treated differently."  Fogelman v.
Mercy Hosp., Inc., 283 F.3d 561, 567 (3d Cir. 2002).  The Court
has also observed that the retaliation provisions of the ADEA

                               -20-

and PHRA are "nearly identical" and has thus interpreted those provisions "as applying identically . . . and governed by the same set of precedents."  Id.  The Court of Appeals has done the same with respect to ADEA and PHRA discrimination claims. E.g., Evanoski v. United Parcel Serv., Inc., 571 F. App'x 92, 95 (3d Cir. 2014).  Having concluded that Trader Joe's is entitled to summary judgment on Stone's ADEA discrimination and retaliation claims, we make the same determination with respect to her discrimination and retaliation claims under the PHRA.

In any event, the motion of Trader Joe's seeks summary judgment "on the claims asserted against it in Plaintiff Dorothy Stone's Complaint," one of which is the PHRA claim.  Stone has advanced no argument in opposition to the contention of Trader Joe's that it is entitled to summary judgment on that claim.

Accordingly, we will grant the motion of Trader Joe's for summary judgment on Stone's PHRA claim.